NO. 07-06-0168-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



OCTOBER 30, 2007


______________________________




WEST TEXAS GAS, INC., APPELLANT



V.



CARTHEL BROTHERS, 4M BROTHERS, J. O. DAWDY,

 

LARRY J. ADRIAN and RONALD D. GRAHAM, APPELLEES

_________________________________



FROM THE 110TH DISTRICT COURT OF FLOYD COUNTY, TEXAS;



NO. 9444; HONORABLE JOHN R. HOLLUMS, JUDGE



_______________________________




Before CAMPBELL and HANCOCK and PIRTLE, JJ.



MEMORANDUM OPINION


 Appellant, West Texas Gas, Inc. (WTG), appeals from a summary judgment entered
in favor of Appellees, Carthel Brothers, 4M Brothers, J. O. Dawdy, Larry J. Adrian, and
Ronald D. Graham, on their breach of contract and Texas Deceptive Trade Practices Act 
claims. WTG contends that it did not overcharge Appellees for natural gas purchased by
Appellees to be used as irrigation fuel. The parties filed competing motions for summary
judgment below. Appellees' motion was granted and WTG's motion was denied. On
appeal, WTG contends the trial court erred in granting Appellees' motion for summary
judgment and in denying WTG's motion for summary judgment because (1) WTG did not
breach its contract with Appellees, and (2) WTG did not violate the DTPA. By its third
issue, WTG asserts the trial court erred in granting Appellees' motion for summary
judgment because it incorrectly ruled on WTG's affirmative defenses. We reverse and
render in part and remand in part.

Background

 WTG sells natural gas to irrigation customers in West Texas, the Texas Panhandle,
and other areas. On various dates ranging from December 12, 1989 through March 16,
1995, WTG and each Appellee entered into standard form Agricultural Gas Service
Agreements.

 The service agreements obligated each Appellee to purchase from WTG their entire
natural gas requirements for fuel for agricultural activities so long as the service
agreements were in effect. Although they had one-year terms, the service agreements
were automatically renewed from year to year absent a written election to terminate 30-60
days before the end of the one-year period. 

 Paragraph two of the service agreements granted WTG the right to set the rates
charged for gas sold to Appellees from time to time:

 Customer agrees to pay for all gas which passes through customer's meter
. . . in accordance with standard rates established. The rate to be charged
will be WTG Rate of [063 or 036] (of which a copy is available upon request)
or subsequent rates, as may be determined by WTG, from time to time . . . 
 

 Paragraph eleven of the service agreements stated that "[n]o agent, representative
or employee of WTG has authority to make any promise, agreement or representation not
incorporated herein, and any such promise, agreement or representation not so
incorporated shall not bind WTG."

 During subsequent years, typically in February or March, WTG would send its
agricultural and irrigation customers, including Appellees, letters containing a rate schedule
for the upcoming growing season with some indication as to whether WTG believed the
rate schedule would remain unchanged throughout the calendar year. For instance, in
January 1992, WTG sent a letter announcing an overall reduction in their rate schedule
but cautioned that an interruption in supplies from their lower cost gas suppliers might
necessitate a price change during the season. And, in September 1992, WTG sent a letter
announcing a price increase late in the 1992 growing season due to volatile trading in
natural gas futures influenced significantly by the damage inflicted by Hurricane Andrew.

 Between 1993 and 1996, WTG's letters contained statements that the year's rate
schedule "will remain unchanged" or was "expected to remain effective" throughout the
calendar year. However, from 1997 to 1999, WTG's letters were more tentative. Although
the letters stated that WTG's rate schedule for the year's growing season "should" or "was
intended" to remain firm, the letters qualified these statements with provisoes. (1) 

 In February 2000, WTG sent a letter to its customers offering various rate
alternatives for the 2000 growing season. Customers were given an option of choosing 
between three different rate programs: Fixed Price, Index Price, and Ceiling Price. The
"Fixed Price" program was described as follows:

 "Fixed Price" Effective for billings issued after March 1, 2000, WTG's
firm monthly rate schedule for the remainder of
calendar year 2000 will be -

 First 50 Mcf $3.55 per Mcf

 Next 450 Mcf $3.15 per Mcf

 Over 500 Mcf $2.80 per Mcf 


 WTG's letter also enclosed a gas sales agreement for making pricing elections
which provided as follows: 

 We have enclosed a gas sales agreement where you may indicate your
pricing election for the 2000 irrigation season. Customers who do not return
an executed gas sales agreement to their local WTG office by March 20,
2000 will be charged according to the "Fixed Price" shown above. 


(Emphasis supplied).


 The enclosed Irrigation and Agricultural Sales Agreement permitted customers to
elect Fixed Price, Index Price, or Ceiling Price, by placing a check in the box next to the
rate program. The Sales Agreement stated that "[e]xecution of this Agreement shall
terminate and supersede any prior agreements between the parties," and was "binding
upon execution by all parties." 

 Paragraph four (4) of the Sales Agreement further stated:

 This Agreement is contingent on availability of natural gas suppliers and third
party transportation services. WTG has the unconditional right to suspend,
discontinue, or decrease, in whole or in part, the delivery of gas hereunder
due to partial or complete curtailment of gas supplies or third-party
transportation services necessary to deliver gas to Buyer. 


 Neither WTG nor Appellees elected to terminate the existing service agreements
prior to the 2000 growing season. Appellees did not respond to WTG's February 2000
letter. 

 In May 2000, WTG sent another letter to its customers indicating that gas
commodity prices had experienced a dramatic increase in excess of fifty percent (50%). 
The letter further indicated that industry experts believed that rising gas usage in electrical
generation, lower than anticipated gas volumes in storage, and warmer than normal
temperatures caused this extreme price increase. As a result, the letter stated that WTG
was increasing its "Fixed Price" rate schedule, and included a revised "Fixed Price" rate
schedule to be made effective July 2000 until further notice. Thereafter, Appellees were
charged according to the revised rate schedule for the remainder of the 2000 growing
season.

 In May 2005, Appellees filed suit against WTG alleging that the rate increase
breached their contracts with WTG and violated the DTPA. In addition to damages for
breach of contract, Appellees sought, among other relief, up to two times their economic
damages under the DTPA, declaratory judgment, and attorney's fees.

 Appellees and WTG filed competing motions for summary judgment. And, without
specifying any grounds, the trial court granted summary judgment in favor of Appellees and
denied WTG's requested relief.

Standard of Review
 

 We review the trial court's summary judgment de novo. Valence Operating
Company v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). We take as true all evidence
favorable to the nonmovant while indulging every reasonable inference and resolve any
doubts in the nonmovant's favor. Sudan v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006). 

 When both parties move for summary judgment on the same issues and the trial
court grants one motion and denies the other, as here, the reviewing court considers the
summary judgment evidence presented by both sides, determines all questions presented,
and if the reviewing court determines that the trial court erred, renders judgment the trial
court should have rendered. Valence Operating Company, 164 S.W.3d at 661. See Bank
of America, N.A. v. Amarillo National Bank, 156 S.W.3d 108, 110 (Tex.App.--Amarillo
2004, no pet.). In doing so, each party bears the burden of establishing the relief claimed
as a matter of law, City of Garland v. Dallas Morning News, 22 S.W.3d 351, 356 (Tex.
2000), and the reviewing court should remand any claims where the summary judgment
burden has not been met. Al's Formal Wear of Houston, Inc. v. Sun, 869 S.W.2d 442, 444
(Tex.App.-Houston [1st Dist.] 1993, writ denied). Moreover, where, as here, the trial
court's order granting summary judgment does not specify the basis for the ruling, we must
affirm summary judgment if any of the summary judgment grounds are meritorious. 
Western Investments, Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005). See Texas
Workers' Compensation Commission v. Patient Advocates of Texas, 136 S.W.3d 643, 648
(Tex. 2004).

Discussion


 The trial court erred in its determination that Appellees' inaction created new
contracts obligating WTG to charge Appellees under a firm monthly rate schedule for the
remainder of 2000. To lock in the firm monthly rate schedule for the entire year, WTG's
February 2000 letter required that Appellees execute the attached Sales Agreement and
return it to their local WTG office by March 20, 2000. Because Appellees failed to comply,
Appellees' rights regarding rate changes remained governed by their existing service
agreements. 

 Under the service agreements, WTG could re-determine rates from time to time
during the calendar year. Thus, when WTG re-determined their rate schedule in May
2000, the re-determination did not constitute a breach of a "new" contract because none
existed. Moreover, because WTG exercised its legal rights under the Service Agreement
when it increased the rate schedule, Appellees' DTPA action fails as a matter of law. 
Accordingly, we reverse the trial court's order granting Appellees' motion for summary
judgment and its order denying WTG's motion for summary judgment, and we grant
judgment in favor of WTG on its motion for summary judgment and deny Appellees' motion
for summary judgment.

 I. Breach of Contract Claim 

 When the interpretation of a contract is in issue, the court must first determine
whether the provisions in question are ambiguous, 14 Tex.Jur.3d Contracts § 222 (2006), 
which is a question of law that must be decided by examining the contract as a whole in
light of the circumstances present when the contract was entered. Enterprise Leasing
Company of Houston v. Barrios, 156 S.W.3d 547, 662 (Tex. 2004). If the contract's
language is susceptible to a certain or definite legal meaning or interpretation, then the
contract is unambiguous and the court will construe the contract as a matter of law. Id. 
Contract terms are given their plain, ordinary, and generally accepted meanings unless the
contract itself shows them to be used in a technical or different sense, Valence Operating
Company v. Dorsett, 164 S.W.3d 656, 662 (Tex. 2005), and an ambiguity exists only if the
contract language is susceptible to two or more interpretations. American Mfrs. Mut. Ins.
Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003). Ambiguity does not arise simply
because the parties offer conflicting interpretations. Id.

 WTG's February 2000 letter offered its customers the option of choosing between
three different rate programs. The letter states "[w]e have enclosed a gas sales agreement
where you may indicate your pricing election for the 2000 irrigation season." The attached
Sales Agreement contains a check box for each of the three rate programs and states
"[t]his Agreement is binding upon execution by all parties." By its express terms, WTG's
offer of a firm monthly rate schedule for 2000 could only be accepted by executing the
attached gas sales agreement. Appellees did not comply with the express terms of WTG's
offer. Thus, no new contract was created and Appellees' rights remained governed by their
existing service agreements. See 14 Tex.Jur.3d Contracts § 81 (2006) ("No contract can
result from an offer or proposal until the other party accepts it in strict accordance with its
terms."). 

 Appellees are mistaken in their contention that WTG's offer could be accepted by
doing nothing. Largely ignoring the remaining provisions of the letter and the Sales
Agreement, Appellees rely on a single sentence for their method of election: "Customers
who do not return an executed gas sales agreement to their local WTG office by March 20,
2000 will be charged according to the "Fixed Price" shown above." This sentence,
however, does not say that Appellees will be charged the "Fixed Price" for a definite term
if they do nothing. The sentence merely states they will be charged according to the
"Fixed Price" if they do nothing. As such, this sentence does no more than inform WTG's
customers that, if they do not elect a new rate program by executing a new sales
agreement, they will be charged as they have in the past, i.e. pursuant to a rate schedule
which was subject to adjustment under the terms of their existing service agreement. 
Absent the parties election to accept WTG's offer and execute a new sales agreement, the
February 2000 letter was like any other received by Appellees before the growing season,
it merely informed Appellees of the rate schedule WTG intended to charge over the coming
months.

 Alternatively, even if the letter contained an offer of a firm monthly rate schedule for
the remainder of 2000 capable of being accepted by inaction, the term could not become
a part of the Appellees' existing contracts because the service agreements expressly
require that such a promise be incorporated in the Agreement before WTG would be
bound thereby. There is no evidence in the record indicating that any language in the
February 2000 letter was incorporated into Appellees' service agreements. (2) Accordingly,
WTG's first issue is sustained and WTG is entitled to a take nothing judgment on
Appellee's breach of contract claims.

 II. DTPA Claim

 Appellees assert that WTG violated the DTPA by (1) making the representation in
its February 2000 letter that the firm monthly rate schedule for the remainder of 2000 
would remain the same and subsequently raising the price in May 2000, and (2) taking
unfair advantage of Appellees by unilaterally raising its gas price in May 2000 at a time
when WTG was the exclusive supplier of their natural gas and it was too late for Appellees
to make alternative arrangements. The gist of Appellees' DTPA claims is that WTG
represented in its February 2000 letter that it wouldn't raise the rate schedule for the
remainder of the 2000 calendar year, and then it committed an unconscionable act by
unilaterally raising the rate schedule in May 2000.

 In Crawford v. Ace Sign, Inc., 917 S.W.2d 12, 13-14 (Tex.1996), the Supreme Court
addressed the tenuous relationship between contract law and the DTPA and concluded
that an allegation of mere breach of contract, without more, does not allege a violation of
the DTPA. As previously discussed, the representations of WTG pertaining to the time the
"fixed rate" schedule would remain unchanged, as contained in its February 2000 letter,
were merely representations of the terms of a contractual offer which the Appellees did not
accept. Appellees' DTPA claims are inextricably intertwined in their contract claims and 
 do not exist independent of those claims. By its own terms, WTG's letter was an offer of
various rate alternatives. If the offer had been accepted as specified, WTG's offer would
have become a contractual duty. Thereafter, if WTG failed to apply the rate schedule as
promised, the appropriate action would be for breach of contract and not the DTPA. Id.

 Because Appellees failed to accept the offer in the manner specified by the letter,
a new contract was not formed and WTG owed them no contractual duty to apply the firm
monthly rate schedule for the remainder of 2000. In May 2000, Appellees rates were re-determined in accordance with the original service agreement between Appellees and
WTG. By exercising its legal rights under the existing contract and adjusting the price,
WTG did not engage in unconscionable conduct, or take unfair advantage of Appellees. 
See DeWitt County Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 103 (Tex. 1999) (holding that
a DTPA claim could not arise from actions permissible under a contract). Neither did
WTG's valid exercise of its legal right to adjust the rate schedule constitute an actionable
misrepresentation under the DTPA. WTG's second issue is sustained and WTG is entitled
to a take nothing judgment on Appellees' DTPA claims.

 III. Affirmative Defenses

 Finally, we pretermit consideration of WTG's third contention that the trial court
erred in granting Appellees' motion for summary judgment based upon an incorrect
disposition of WTG's affirmative defenses. While we are mindful of this contention, our
disposition of issues one and two eliminates the necessity that we consider this issue. (3)

Conclusion


 For the reasons stated above, the trial court's judgment granting Appellees' motion
for summary judgment and denying WTG's motion for summary judgment is reversed and
judgment is hereby rendered denying Appellees' motion for summary judgment and
granting WTG's motion for summary judgment that Appellees take nothing on their claims. (4) 
Furthermore, all costs are assessed against Appellees and the cause is remanded to the
trial court for determination of the merits of WTG's claim for further relief under the
provisions of Tex. Civ. Prac. & Rem. Code § 37.009.


 Patrick A. Pirtle

 Justice 


 
1. For instance, the 1997 letter stated that "WTG intends to maintain this firm rate
schedule for the remainder of the 1997 calendar year, provided there is not a significant
increase in the delivery charges that WTG pays . . . ." The 1998 letter stated, "[t]he new
rate schedule should remain firm for the remainder of the 1998 calendar year, provided
there is not a significant increase in the delivery charges . . . ." WTG's 1999 letter stated
that "WTG intends to maintain this firm rate schedule throughout the 1999 growing season,
however should there be a significant increase in the delivery charges that WTG pays to
Westar Transmission Company, WTG will provide its customers with a thirty (30) day
notice of any changes in our schedule reflected above."
2. Appellees did not assert below, and the Court does not consider, whether a
modification of the Service Agreement was possible under the circumstances. However,
given the language of Appellees' service agreements, we doubt a modification would be
possible unless it were incorporated into the Service Agreement in accordance with its
terms.
3. Tex. R. App. P. 47.1. 
4. In reversing the trial court's order denying WTG's motion for summary judgment 
and in rendering judgment in favor of WTG, we are mindful of the fact that WTG's Notice
of Appeal references only "the trial court's judgment rendered on April 4, 2006, in its Order
Granting Plaintiff's Motion for Summary Judgment Nunc Pro Tunc (emphasis added)." 
The referenced order does contain a "Mother Hubbard" clause indicating an intent to
dispose of all relief not expressly granted therein, thereby implicitly incorporating the March
21, 2006, Order Denying Defendant's Motion for Summary Judgment. Furthermore, the
final judgment of the court can consist of a series of orders that, when taken together,
disposes of all claims and parties. See Mafrige v. Ross, 866 S.W.2d 590, 591 (Tex.1993),
overruled in part on other grounds, Lehmann v. Har-Con Corp., 39 S.W.3d 191 (Tex.
2001).



t-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 mso-bidi-language:EN-US;}
p.MsoHeading9, li.MsoHeading9, div.MsoHeading9
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 9 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:9;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoHeader, li.MsoHeader, div.MsoHeader
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Header Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoFooter, li.MsoFooter, div.MsoFooter
 {mso-style-priority:99;
 mso-style-link:"Footer Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoCaption, li.MsoCaption, div.MsoCaption
 {mso-style-noshow:yes;
 mso-style-priority:35;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 mso-pagination:widow-orphan;
 font-size:9.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;}
p.MsoTitle, li.MsoTitle, div.MsoTitle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpFirst, li.MsoTitleCxSpFirst, div.MsoTitleCxSpFirst
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpMiddle, li.MsoTitleCxSpMiddle, div.MsoTitleCxSpMiddle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpLast, li.MsoTitleCxSpLast, div.MsoTitleCxSpLast
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoSubtitle, li.MsoSubtitle, div.MsoSubtitle
 {mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Subtitle Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 font-size:10.0pt;
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-11-0149.cr%20%20opinion_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-11-0149.cr%20%20opinion_files/header.htm") fcs;
 mso-endnote-separator:url("07-11-0149.cr%20%20opinion_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-11-0149.cr%20%20opinion_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-page-numbers:1;
 mso-title-page:yes;
 mso-footer:url("07-11-0149.cr%20%20opinion_files/header.htm") f1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
@page WordSection2
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-11-0149.cr%20%20opinion_files/header.htm") f2;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
-->








NO. 07-11-00149-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL A

 



AUGUST
1, 2011

 



 

GLENN ERVIN ANDERS, APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 



 

 FROM THE 20TH DISTRICT COURT OF
MILAM COUNTY;

 

NO. CR22898; HONORABLE EDWARD P. MAGRE, JUDGE



 



 

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

 

ORDER OF ABATEMENT AND REMAND

            Appellant,
Glenn Ervin Anders, pleaded guilty to two counts of indecency with a child by
contact and was sentenced to ten years imprisonment.  He timely filed a notice of appeal with
respect to his convictions.

On July 8, 2011, this Court received
appellants brief in which counsel appears to rely on the procedure outlined in
Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).  We refused to file said brief because we
noted a substantive defect in the brief and omitted steps in the Anders
procedure.  Counsel failed to file a
motion to withdraw and, in his brief, prayed for reversal and remand, relief
that is inconsistent with the Anders procedure for frivolous
appeals.  See In re Schulman,
252 S.W.3d 403, 408 (Tex.Crim.App. 2008); Jeffrey v. State, 903 S.W.2d
776, 77980 (Tex.App.Dallas 1995, no pet.). 
Additionally, counsels letter to appellant failed to satisfy all of the
educational burdens placed on counsel in the Anders context.  See In re Schulman, 252 S.W.3d
at 408.  

By letter dated July 8, this Court
notified counsel of the defects and directed counsel to file a motion to
withdraw, an excerpt to be amended to the brief that prayed for appropriate
relief, and a supplemental letter to appellant that satisfied counsels
remaining educational burdens.  Counsel
was directed to respond on or before July 25. 
To date, however, counsel has not responded to the Courts directive.

It is counsels duty to request leave
to withdraw from representation in the event he believed the appeal to be
frivolous.  Id. at 407.  Unless or until counsel has filed a motion to
withdraw, this Court cannot proceed in an orderly fashion in the Anders
context.  Id. at 41112.

Consequently, we now abate this
appeal and remand the cause to the trial court for further proceedings.  Upon remand, the trial court shall
immediately determine the following: (1) whether appellant desires to prosecute
the appeal; (2) if so, whether appointed counsel intended to file an Anders
brief; (3) if appellants counsel did intend to file an Anders brief;
why he has failed to file a motion to withdraw, correct the inconsistent
prayer, and supplement his educational burdens letter to appellant; (4) if
appellants counsel did not intend to file an Anders brief, whether he
has abandoned the appeal by failing to correct the inconsistent positions taken
in appellants brief; (5) if appellants counsel has abandoned the appeal,
whether new counsel should be appointed on appeal; (6) any additional issues
the trial court finds material to ensuring appellant receives effective
assistance of counsel on appeal.  See
Tex. R. App. P. 43.6.

The trial court shall execute
findings of fact and conclusions of law, and cause the same to be included in a
supplemental clerks record to be filed with the Clerk of this Court by August 31,
2011.  A supplemental reporters record
of any hearing shall also be included in the appellate record if requested by
appellate counsel.  Should the trial
court determine that new counsel should be appointed on appeal, the trial court
shall provide this Court with the name, address, telephone number, and state
bar number of the newly-appointed counsel.

It is so ordered.

Per
Curiam








Do
not publish.